**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>DIANA SWAN,<br><br>                       Debtor<br><br>MORGAN KEEGAN & CO., INC.,<br><br>                       Plaintiff<br><br>v.<br><br>DIANA SWAN,<br><br>                       Defendant | Chapter 7<br>Case No. 11-11720-FJB<br><br><br><br><br><br>Adversary Proceeding<br>No. 11-1356 |

**MEMORANDUM OF DECISION**

By its complaint in the adversary proceeding, plaintiff Morgan Keegan & Company, Inc. ("Morgan Keegan") seeks a determination that a debt owed to it by defendant and chapter 7-debtor Diana Swan ("Ms. Swan") is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B) as a debt arising from a materially false financial statement. After a trial, the Court now makes the following findings of fact and rulings of law, and on the basis thereof, concludes that Morgan Keegan's claim is excepted from discharge.

**Facts**

From 1988 to November 2007, Ms. Swan maintained two margin accounts at UBS Paine Weber ("UBS"). One was a joint account with her 86-year-old mother, Dorothy Swan, and the other was in Ms. Swan's name alone.[1] Both accounts held stock in Video Display Corporation ("VIDE"). In early

---

[1] "A margin account is a device used to extend credit to investors who buy securities. Initially, the investor pays only a percentage of the purchase price, borrowing the difference from the brokerage firm. The purchased

November 2007, UBS expressed concern over the number of shares she held in VIDE—the stock being very speculative, and the accounts being heavily invested in it—and asked her to either sell some of the shares or to transfer the accounts to another brokerage firm.  On or about November 13, 2007, Ms. Swan transferred the accounts to Morgan Keegan.

To transfer the accounts, Ms. Swan spoke with a sales assistant at Morgan Keegan, Jennifer Borus, and with Ms. Borus alone.[2]  By answering questions from Ms. Borus over the phone, Ms. Swan completed a new account questionnaire, which collected, among other things, financial information about Ms. Swan, including her annual income, net worth and liquid net worth.  Ms. Borus entered all of the information into Morgan Keegan's computer system. The same process was done for the joint account.  Warren Allen, a delegate of the branch manager, reviewed the information regarding both accounts for typographical and other obvious errors and approved the account transfers.  Two "new account forms" ("NAF"s) were generated; these NAFs included the information that Ms. Swan had given Ms. Borus over the phone; and Morgan Keegan mailed these to Ms. Swan and Dorothy Swan to review and, by their signatures thereon, to verify.  They signed the new account forms, which are not complex, lengthy, or difficult to understand, and returned them to Morgan Keegan.  Above the signature line, the NAFs included the following language:  "I/We have REVIEWED THE FINANCIAL INFORMATION AND INVESTMENT OBJECTIVES AND AGREE THAT THIS INFORMATION IS CORRECT."

Ms. Swan testified at trial that she had signed not a completed form but a blank form, but, after trial, she made no request for a finding to this effect.  In any event, this testimony is not credible.  Ms Borus testified credibly that all of the information must be complete and entered into Morgan Keegan's

---

securities are themselves used as collateral for the loan. The arrangement is a dynamic one, however, because the value of stock fluctuates. If the market price of the securities decreases, the collateral's value is diminished and the broker may demand that the investor deposit incremental funds." *Advest, Inc. v. McCarthy*, 914 F.2d 6, 7 (1st Cir. 1990).

[2] Ms. Borus did not also speak to Dorothy Swan, who had no role in the transfer of the accounts.

system in order for an NAF to be generated.  Morgan Keegan could not and, I find, did not send her a blank NAF to sign.

The new account forms that Ms. Swan signed contained the following information:  that Ms. Swan was single; that her approximate annual income was over $150,000; that her approximate liquid net worth was over $1,000,000; that her approximate net worth was between $1,000,000 and $5,000,000; that her tax bracket was 28%; that her occupation was a homemaker; and that speculation was her top investment objective.  Notwithstanding these assertions, Ms. Swan's joint federal tax returns with her husband showed annual income of $91,802 in 2006 and $98,310 in 2007.  Of that combined income, only $19,000 was attributable to her—the balance was her husband's.  With respect to liquid net worth, at the time she signed the new account forms, Ms. Swan had a stock portfolio worth approximately $802,354.76$^3$ and additional cash of $50,000 to $60,000.

Ms. Swan testified that she had "overestimated" her liquid net worth and annual income on the new account forms.  She stated that at the time she signed the new account forms, she believed that all of the information she provided was accurate.  She explained that because her husband owned his own business, she had believed that their annual income was $150,000.  She also testified that she is an unsophisticated investor who does not understand the risk involved with a margin account or regularly check her account statements.  Lastly, she stated that she never intended to deceive Morgan Keegan.

I do not find Ms. Swan's testimony credible.  In April of 2007, Ms. Swan had signed her and her husband's joint federal income tax returns for 2006.  She was aware that her annual income was less than what she represented to Morgan Keegan; and her tax return for the next year shows no material change in income during 2007.  She does not contend that she did not understand the meaning of "liquid net worth," and she offers no explanation for the substantial overstatement of that amount.  I

---

$^3$ The stocks in her portfolio were worth $1,292,670 less an outstanding debit balance of $490,315.24, which Morgan Keegan paid UBS when the accounts were transferred.

3

conclude that she made the misrepresentations with knowledge of their falsity or, in the case of the liquid net worth, at least with reckless disregard for the accuracy of her representation.

Ms. Borus testified, and I find, that it is not Morgan Keegan's normal business practice to require proof of income or assets or to further investigate the financial information provided by a prospective client. She further testified that based on her considerable experience in the industry, both at Morgan Keegan and two other firms, it was not ordinary practice in the industry to require proof of assets or to run credit checks on potential clients. She explained that once an account is opened, Morgan Keegan's practice is to update a client's information every three years or at the request of the client. I credit Ms. Borus's testimony on these issues.

The last witness was Mr. Hamilton, the branch manager of the office where the accounts were held. As he explained, a prospective client's annual income and liquid net worth affect Morgan Keegan's decision to approve an account. Annual income affects the overall approval of the account, as it reflects the ability of the client to meet his or her obligation when borrowing money. Liquid net worth is more important when approving a margin account: any liquid net worth in excess of assets that Morgan Keegan holds goes to the ability of the client to cover a margin call.[4] Morgan Keegan relies on this representation in deciding whether to approve a new account. Lastly, he stated, credibly, that based on in his 36 years of working in the industry, it is not customary to investigate any of the financial information provided by a prospective client. I find that Morgan Keegan relied on the representations of income and liquid net worth in making its decision to accept Ms. Swan's accounts, and that this reliance was in keeping with its own internal standards and with standards in its industry.

Sometime after the accounts were transferred, Ms. Swan and Dorothy Swan authorized the transfer of all assets from the joint account into Ms. Swan's individual account. After the two accounts

---

[4] He provided the following example: "If I [Morgan Keegan] hold a half million dollars of assets for a client and a client reflects liquid net worth of a million, then I believe that the client has a half a million dollars of liquid net worth somewhere else."

were merged, and on or around January, 2009, the value of the stock declined, and Morgan Keegan therefore made a margin call. Ms. Swan covered the margin call and paid Morgan Keegan $60,000, which was essentially all of her liquid assets. Then shortly after, Morgan Keegan made a second margin call, which Ms. Swan was unable to cover. On or around March, 2009, Morgan Keegan therefore liquidated the remaining stock in her account, leaving a debit balance of approximately $240,000. Subsequently, per their client agreement, Ms. Swan and Morgan Keegan went to arbitration. Morgan Keegan was awarded a judgment for compensatory damages in the amount of $242,116.96 plus costs and attorneys' fees in the amount of $72,480.00.

**Procedural History**

On July 29, 2011, Ms. Swan filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Morgan Keegan commenced the instant adversary proceeding seeking a determination that the debt owed to it by Ms. Swan pursuant to the arbitration award is nondischargeable under 11 U.S.C. § 523(a)(2)(B). At trial, Ms. Swan and two representatives from Morgan Keegan, Ms. Borus and Mr. Hamilton, testified. At the conclusion of evidence, I took the matter under advisement. Both parties submitted post-trial briefs.

**Jurisdiction**

The matter before the court is the complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt. The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding. 28 U.S.C. § 157(b)(2)(I) (core proceedings include determinations as to the dischargeability of particular debts). This court accordingly has authority to enter final judgment in the matter. 28 U.S.C. § 157(b)(1).

5

**Positions of the Parties**

Morgan Keegan asserts that the debt owed to it by Ms. Swan is nondischargeable under § 523(a)(2)(B) because the debt was incurred by the use of materially false statements regarding her financial condition. Morgan Keegan contends that the financial information Ms. Swan provided on the NAFs was materially false, that it relied on this information when deciding to approve the transfer of the accounts, that this reliance was reasonable, and that Ms. Swan submitted the false NAFs with intent to deceive.

Ms. Swan argues that the falsity of the NAFs was not material. Ms. Swan does not dispute that Morgan Keegan relied on the false information in the NAFs but contends that this reliance was not reasonable because Morgan Keegan made no independent investigation of the information she provided and did not update the information once the accounts were transferred. Additionally, she contends, there were "red flags" in the new account forms that should have alerted Morgan Keegan that further investigation of the information on the NFAs was required. Lastly, Ms. Swan asserts that she never intended to deceive Morgan Keegan; she maintains that, at the time she completed the forms, she believed all the information she provided was accurate.

**Discussion**

Section 523(a)(2)(B) provides:

(a) A discharge under 727…of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

    (B) use of a statement in writing

        (i) that is materially false;
        (ii) respecting the debtor's or an insider's financial condition;
        (iii) on which the creditor to whom the debtor is liable for such money, property and services, or credit reasonably relied; and
        (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). A creditor seeking to except a debt from discharge bears the burden of proving each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). "In furtherance of the Bankruptcy Code's 'fresh start' policy, exceptions to discharge are narrowly construed." *Danvers Savings Bank v. Alexander (In re Alexander)*, 427 B.R. 183, 193 (Bankr. D. Mass 2010), citing *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).

There is no dispute that the new account forms signed by Ms. Swan were written statements concerning her financial condition. The remaining issues before the Court are: (a) whether falsehoods in the NAFs were material; (b) whether Morgan Keegan's reliance on the false information when approving the transfer of the accounts was reasonable; and (c) whether Ms. Swan submitted the new account forms with the intent to deceive Morgan Keegan.

### a. Materially False Statement

To except a debt from discharge under § 523(a)(2)(B), the creditor must prove that, when the financial statement was made, it was not only false but "materially" so. A financial statement is materially false if it

> paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit. The question of materiality should be judged not on the basis of size or seriousness of the error but by a comparison of the debtor's actual financial condition with the picture he paints of it. A financial statement which markedly overstates the value of a person's assets, so as to distort his financial picture must be considered materially false.

*Merchants Nat'l Bank v. Denenberg (In re Denenberg)*, 37 B.R. 267, 271 (Bankr. D. Mass. 1983) (internal citations omitted).

The new account forms grossly overstated Ms. Swan's actual financial condition. The forms reported annual income of $150,000 and liquid net worth of over one million dollars. The actual figures were quite different. Her 2006 and 2007 federal tax returns showed combined annual income with her

7

husband of $91,802 and $98, 310. Of that combined income, only $19,000 was Ms. Swan's own income. With respect to liquid net worth, she had a stock portfolio worth approximately $802,000 and cash of approximately $50,000 to $60,000.

Ms. Swan contends that "material falsity" requires proof that the debtor must have known of the falsity of the representations when she made them." For this she cites case law interpreting pre-Code bankruptcy law. Her reliance on pre-Code law is misplaced and, in any event, a misinterpretation of § 523(a)(2)(B), which deals with the debtor's state of mind and specific intent in § 523(a)(2)(B)(iv) (requiring intent to deceive), not § 523(a)(2)(B)(i) (requiring that statement be "materially false").

Accordingly, the Court concludes that the gross misrepresentations of annual income and liquid net worth were material.

   b.  **Reasonable Reliance**

The reasonableness of reliance is to be objectively determined in view of the totality of the circumstances. *In re Figge*, 94 B.R. 654, 665 (Bankr. C.D. Cal. 1988); see also *Collier on Bankruptcy*, at ¶ 523.08[2][d]. In cases of lending institutions, this standard is determined by comparing the lender's "actual conduct with its normal business practice, the standards and custom in the industry and the particular circumstances concerning the loan application." *In re Denenberg*, 37 B.R. 267, 272 (Bankr. D. Mass. 1983) (internal citations omitted); see also *In re Herzog*, 140 B.R. 936, 938 (Bankr. D. Mass. 1992) (courts in this district have held that such reliance may be determined by comparing a bank's regular practice with industry standard and with that which occurred during the transaction in question).

Ms. Swan argues that Morgan Keegan's reliance on the falsehoods in the NAF was not reasonable because Morgan Keegan made no independent inquiry of the information she provided and did not update the information once the accounts were transferred. Both Ms. Borus and Mr. Hamilton testified that it was not Morgan Keegan's normal business practice to run credit checks or verify proof of income and assets of potential new clients. Both further testified that it is not customary in the

brokerage industry to make such an inquiry when opening a margin account. Moreover, it is Morgan Keegan's policy to update account information only every three years or at the request of a client. As Ms. Swan's account was opened in 2007, it was not scheduled to be updated until 2010. Finally, Ms. Swan did not contact Morgan Keegan to report any changes to the account information. Accordingly, the Court finds that Morgan Keegan acted reasonably when relying on the information she provided on the new account form without conducting further inquiry.

Ms. Swan also argues that any reliance by Morgan Keegan was unreasonable because there were "red flags" that should have put Morgan Keegan on notice that the information was inaccurate. While a lender is not required to make affirmative inquiries upon a receipt of a financial statement, it will nevertheless be considered to have acted unreasonably if it ignores obvious "red flags." *In re Herzog*, 140 B.R. at 938.

Ms. Swan contends that her annual salary of $150,000 as a homemaker should have raised a red flag that required further verification. Ms. Borus testified that Morgan Keegan has several clients that are homemakers with comparable annual income derived from sources such as alimony, trust payments, and income from rental property. The Court finds credible this explanation as to why this did not raise a red flag.

Alternatively, Ms. Swan asserts that the high-risk, speculative investment objective listed as a top priority for the joint account with her 86-year-old mother should have alerted Morgan Keegan to an issue. Based on the totality of the circumstances surrounding the transfer of the accounts, the Court does not see this as an obvious red flag for two reasons. First, Ms. Swan was listed as the primary account holder on the joint account. As the primary account holder, Ms. Swan's age, investment objectives and financial information were also considered when deciding to approve the account. The priority of the speculative objective on Ms. Swan's joint account was consistent with the objectives listed on her individual account. Furthermore, the VIDE stock Ms. Swan sought to transfer to Morgan

9

Keegan was highly speculative. Again, this was consistent with the speculative investment objective listed on the joint account form. The Court concludes that Morgan Keegan did not ignore obvious "red flags" and that its reliance on the new account forms was reasonable. In any event, even if this should have raised a red flag, the flag would not have concerned income or liquid net worth, only the prudence of the investment strategy.

    **c.   Intent to Deceive**

Intent to deceive may be proven by direct or circumstantial evidence. *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995). Because direct evidence of intent is rarely available, courts have held that intent to deceive may be inferred from the totality of the circumstances surrounding the debtor's act, including the debtor's reckless indifference to, or reckless disregard of, the accuracy of the financial information submitted to the creditor. *Ins. Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1119 (3rd Cir. 1995). "A debtor's mere unsupported assertions of honest intent will not overcome natural inferences derived from admitted facts." *Agribank v. Webb (In re Webb)*, 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000).

Ms. Swan denies that she had the requisite intent to deceive Morgan Keegan. Although the financial information was materially false, Ms. Swan contends that at the time she completed the new account forms, she believed that all information she provided was accurate. The Court does not find these assertions credible. As to her income, Ms. Swan made her statement with knowledge of its falsity. As to liquid net worth, she made the statement either with knowledge of its falsity or, at least, with reckless disregard for the truth of the matter asserted, which was easily determinable from account statements and published daily valuations of her stock holdings. The Court simply does not view as credible Ms. Swan's assertions that she is an unsophisticated investor who did not understand the risk involved with a margin account. Ms. Swan maintained two margin accounts with UBS for over 19 years. Her portfolio was comprised of high-risk, speculative VIDE stock. Her blanket assertions that she did not

have the intent to deceive Morgan Keegan does not overcome the inference that she acted with reckless disregard for the accuracy of the financial information she submitted to Morgan Keegan.

**Conclusion**

For the reasons set forth above, Morgan Keegan's debt is excepted from discharge. A separate judgment shall enter accordingly.

Date: October 2, 2013                                  _____
                                                      Frank J. Bailey
                                                      United States Bankruptcy Judge